# Exhibit D

1
2    **A. No.**
3    Q. Had you ever had a conflict with
4  Officer Wilkowski at work?
5    **A. No.**
6    Q. So, you told me that you remembered
7  that Mr. McCane was being defiant. Do you
8  remember specifically in what ways he was
9  defiant?
10    **A. Not listening to the orders given to**
11  **him in a proper timeframe.**
12    Q. What do you consider to be a proper
13  timeframe?
14    **A. After asking somebody you expect to**
15  **acknowledge and comply with the direct order.**
16    MS. ROBIN: I'm sorry, could I
17  hear that read back?
18    (Whereupon, the record was read
19  by the reporter.)
20    Q. How long do they have to do that?
21    **A. Normally they have a response as**
22  **soon as you give a direct order they respond.**
23    Q. So, you remembered, in your words,
24  he was defiant and he wasn't complying with
25  direct orders, what happened?

1
2     A.    He had to be repeated those direct
3  orders several times.
4     Q.    What happened next?
5     A.    Then he went through the process of
6  being admitted to SHU.
7     Q.    What generally is the process of
8  being admitted to SHU?
9     A.    You're brought into SHU and they're
10 asked to give their name and pin number to a
11 camera.
12    Q.    Is admission to SHU always recorded?
13    A.    Yes.
14    Q.    Why is it recorded?
15    A.    Policy and procedure.
16    Q.    Is that a written policy and
17 procedure?
18    A.    That I'm aware of, yes.
19    Q.    Is there a policy and
20 procedure manual that's specific to SHU?
21    A.    Yes.
22    Q.    Does that also describe what use of
23 force is permissible within SHU?
24    A.    Everything given -- any order given
25 to an inmate is considered a direct order.

1
2    Q.  My question was just whether there
3 was a written policy and procedure regarding
4 use of force that pertains to SHU?
5    A.  Not that I recall at this time.
6         MR. MACKEY:  Caitlin, are you
7      asking if there's separate specific
8      orders just for SHU?
9         MS. ROBIN:  Correct.
10         MR. MACKEY:  Okay.
11    Q.  I'm sorry, you said that they are
12 videotaped and they're brought in.  What
13 happens next when processing an inmate to
14 SHU?
15    A.  They are sat on a B.O.S.S. chair,
16 which will locate any metals in their
17 cavities.
18    Q.  After they're sat on the chair, what
19 happens next?
20    A.  Then they are stood up and walked
21 over to an area where they are strip-frisked.
22    Q.  What is a strip frisk?
23    A.  That involves the inmate removing
24 all articles of clothing and that clothing is
25 frisked and an officer is observing the

1
2  inmates body for any injuries or cuts.
3      Q.  What's the purpose of that?
4      **A.  To make sure that they're safe and**
5  **they're not carrying any kind of contraband**
6  **on their persons.**
7      Q.  Are there any other reasons for the
8  strip-frisk other than searching for
9  contraband?
10     **A.  And for injuries.**
11     Q.  What's your responsibility if you
12  visualize an injury?
13     **A.  Notify your area supervisor and**
14  **medical and have it documented.**
15     Q.  Is there any documentation that's
16  part of your responsibility when you're
17  admitting an inmate to SHU?
18     **A.  I'm sorry, can you repeat that?**
19     Q.  Sure.  As part of admitting an
20  inmate to SHU, are there any written
21  documents that you make as part of the intake
22  process?
23     **A.  Yes.**
24     Q.  What is that document?
25     **A.  There is a mental health evaluation**

1
2  done by the sergeant.
3     Q. Anything else?
4     **A. And a body receipt of the**
5  **strip-frisk.**
6     Q. What is a body receipt?
7     **A. It's stating that there's no**
8  **contraband found and the inmate has no**
9  **injuries.**
10    Q. So, you document for contraband and
11 you also document for physical observation of
12 the body, correct?
13    **A. Correct.**
14    Q. Does anything else go on the body
15 receipt?
16    **A. Not that I remember.**
17    Q. Is any other documentation required
18 when processing an inmate through SHU?
19    **A. Not that I remember off.**
20    Q. So, after the strip-frisk what
21 happens?
22    **A. They are escorted to their cell.**
23    Q. When you're escorted to your cell,
24 should an inmate be clothed before
25 transferred to the cell?

1
2      A.   No.
3      Q.   Do you have pepper spray?
4      A.   At that time they did not have OC
5   spray.
6      Q.   Was there any other type of
7   intervention that you carried?
8      A.   No.
9      Q.   Did Mr. McCane resist you when you
10  implemented the figure four hold?
11     A.   In the beginning he did.
12     Q.   How?
13     A.   His leg were locked out.
14     Q.   Please describe to me what you mean
15  by that?
16     A.   His legs were stiff, he was holding
17  them straight.
18     Q.   How was he doing that?
19     A.   By flexing his muscles in his legs.
20     Q.   What, if anything, did you do?
21     A.   I forced his left ankle up by
22  keeping pressure on his knee so I could bend
23  it over his right leg and pull his ankle to
24  up to lock it in place.
25     Q.   During the frisk did you see

```
 1
 2     Officer Wilkowski slam Mr. McCane into the
 3     wall?
 4          A.   I could not see it,
 5     Officer Wilkowski was in my view.
 6          Q.   Where were you standing at the time
 7     that Mr. McCane was processed into SHU?
 8          A.   Directly behind Officer Wilkowski.
 9          Q.   When you say directly behind
10     Officer Wilkowski, could you describe to me
11     the room and where both of you were standing?
12          A.   He was in the frisk area,
13     strip-frisk area and I was standing directly
14     behind him in the same room.
15          Q.   Can you estimate about how many feet
16     you were apart?
17          A.   Seven, eight feet.
18          Q.   During the time that Mr. Wilkowski
19     was talking to Mr. McCane about where to
20     face, did you ever feel that you were in
21     danger?
22          A.   No.
23          Q.   After you took Mr. McCane down to
24     the ground, what, if anything, happened?
25          A.   Mechanical restraints were put on
```

1
2  him.
3      Q.  When you say mechanical restraints,
4  what do you mean?
5      A.  Handcuffs.
6      Q.  What type of handcuffs?
7      A.  Just state issued handcuffs.
8      Q.  Did Officer Wilkowski place the
9  handcuffs?
10     A.  I don't recall.
11     Q.  Was Officer Wilkowski the Number 1
12 Officer while processing Mr. McCane?
13     A.  Yes.
14     Q.  Were any other officers present at
15 the time?
16     A.  Officer Bunn and Sergeant Dennis.
17     Q.  Where was Officer Bunn standing?
18     A.  I don't recall where he was
19 standing.
20     Q.  Do you recall where Sergeant Dennis
21 was?
22     A.  He was to the right of me.
23     Q.  What was he doing?
24     A.  He was observing the strip-frisk.
25     Q.  Is there a policy regarding how many

1
2  officers should observe a frisk?
3      A.  Not that I recall.
4      Q.  Was there a custom and practice,
5  based upon your experience, when admitting an
6  inmate to SHU of how many officers would be
7  involved in the frisk procedure?
8      A.  **Just the officer doing the frisk and**
9  **the officer frisking the clothing.**
10     Q.  So, would it be unusual for three or
11 four officers to be there?
12     A.  **No.**
13     Q.  I hope I'm just understanding this
14 correctly.  It sounds like there's normally
15 two officers, a first officer and a second
16 officer, or is it common that there would be
17 three officers and a sergeant there?
18     A.  **That's two officers actually**
19 **doing -- one doing the strip-frisk, one**
20 **frisking the clothes.  The sergeant is**
21 **adjacent -- close to the room but not in that**
22 **same area as the inmate being frisked.**
23     Q.  After Mr. McCane was handcuffed,
24 what did you do?
25     A.  **Assisted him to his feet.**



```
 2     Q.   What happened next?
 3     A.   He was then escorted to a cell.
 4     Q.   When you assisted him to his feet,
 5   did he say anything to you?
 6     A.   Not that I recall.
 7     Q.   Did he have any complaint of pain?
 8     A.   Not that I recall.
 9     Q.   Did he request medical assistance?
10     A.   Not that I recall.
11     Q.   Were you injured in any way?
12     A.   No, I was not.
13     Q.   You went to the infirmary at some
14   point, correct?
15     A.   I don't recall.
16     Q.   Do you recall ever being assessed by
17   a nurse who indicated that you had no
18   injuries?
19     A.   Yes.
20     Q.   After he was handcuffed at any point
21   did you give Mr. McCane his clothes to put
22   on?
23     A.   I did not.
24     Q.   Officer, is it correct that you
25   transported him to a cell naked?
```

1
2  the time.
3     Q.  And why?
4     A.  **I don't know because I can't see**
5  **what was going on.**
6     Q.  Did you feel threatened at the time?
7     A.  **I couldn't -- not by the inmate or**
8  **Officer Wilkowski.**
9        MS. ROBIN:  I'm sorry, can I
10     hear that answer read back?
11       (Whereupon, the record was read
12     by the reporter.)
13    Q.  So, did you feel threatened at this
14  time, yes or no?
15    A.  **I did not feel threatened.**
16    Q.  I'm just looking at minute 5:27, is
17  that you who appears on the screen?
18    A.  **Yeah, can you replay it?**
19       **(Video played.)**
20    A.  **Yes, that was me.**
21    Q.  What are you doing?
22    A.  **Applying the figure four body hold**
23  **restraint on inmate.**
24    Q.  Who is the other officer there with
25  you?

1
2      A.   Officer Bunn.
3           (Video played.)
4      Q.   Who appears on the screen right now?
5           Do you know who that is?
6      A.   That's Sergeant Dennis.
7      Q.   Do you know what Sergeant Dennis is
8  doing there?
9      A.   I do not know.  I was applying the
10 figure four leg lock on him.  On the inmate.
11          (Video played.)
12     Q.   Officer Masucci, did you hear him
13 say, put him back?
14     A.   It was hard to make out what he was
15 saying.
16     Q.   Do you find Officer Wilkowski hard
17 to understand?
18     A.   At that point, yes.
19     Q.   Is there anything else that you
20 remember from your encounter with David
21 McCane that day that we haven't discussed?
22     A.   Not that I recall at this time.
23     Q.   After this encounter did you discuss
24 with Sergeant Dennis what to put in your use
25 of force memo?

1
2     **A.  I did not.**
3     Q.  Did you discuss with
4  Officer Wilkowski what to put in your use of
5  force memo?
6     **A.  I did not.**
7     Q.  Did you talk to Officer Bunn about
8  what to put in your use of force memo?
9     **A.  I did not.**
10    Q.  Did you ever see David McCane again
11 after this day?
12    **A.  I did not.**
13    Q.  Since this time, have you ever been
14 implicated in any other excessive force
15 claims involving an inmate?
16    **A.  No, I have not.**
17    Q.  Did you speak with Officer Wilkowski
18 about your testimony today?
19    **A.  I did not.**
20    Q.  Do you keep in touch with
21 Officer Wilkowski or Officer Bunn or Sergeant
22 Dennis?
23    **A.  I do not.**
24    Q.  I really want to thank you for your
25 time today and I have no further questions.

75

1
2     **A. Thank you.**
3         MR. MACKEY: On behalf of
4 Mr. Masucci we're ordering a copy of
5 the transcript.
6         MR. SLEIGHT: On behalf of
7 Defendant Hillman we're ordering a
8 copy of this transcript.
9         (11:58 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

76

1

2                    I N D E X

3

   WITNESS            EXAMINATION BY        PAGE
4
   Costantino Masucci  Ms. Robin            7
5

6                    EXHIBITS

7  PLAINTIFF'S       DESCRIPTION            PAGE

8  1                 doc                    43
   2                 video                  53

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Reporter's Ink, Corp.   Phone: 646.395.2522   Fax: 212.374.1236   www.reporters-ink.com



77

1
2             A C K N O W L E D G E M E N T
3    STATE OF NEW YORK)
4                         :ss
5    COUNTY OF NEW YORK)
6        I, Costantino Masucci, hereby certify that
7    I have read the transcript of my testimony
8    taken under oath on August 20th, 2021, that
9    the transcript is a true, complete and correct
10   record of what was asked, answered and said
11   during my testimony under oath, and that the
12   answers on the record as given by me are true
13   and correct.
14
15              _____
16                        Costantino Masucci
17
18   Signed and subscribed to
19   before me, this _____ day
20   of _____, _____.
21
22   _____
23   Notary Public
24
25



**Reporter's Ink, Corp.**     Phone: 646.395.2522     Fax: 212.374.1236     www.reporters-ink.com